UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SAMANTHA R. BRADLEY,

       Plaintiff,                    Civil Action No. 14-14138

v.                            HON.  STEPHEN J. MURPHY, III
                                  U.S. District Judge
                                  HON. R.  STEVEN WHALEN

COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

       Defendant.
_____/

## REPORT AND RECOMMENDATION

    Plaintiff Samantha R. Bradley, ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment [Docket #15] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #12] be DENIED.

## PROCEDURAL HISTORY

    Plaintiff filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") on October 4, 2011 and October 17, 2011

-1-

respectively,  alleging disability as of August 1, 2011 (Tr. 173-180, 181-186).  After the initial denial of the claim, Plaintiff requested an administrative hearing, held on March 7, 2013 in Mount Pleasant, Michigan (Tr. 44).  Administrative Law Judge ("ALJ") Joy Turner presided (Tr. 44).  Plaintiff, represented by attorney Andrea Hamm, testified (Tr. 48-72), as did Tiffany Dawkins (Tr. 73-79), and Vocational Expert ("VE") James Lozer (Tr. 80-84).  On May 17, 2013, ALJ turner found that Plaintiff was not disabled (Tr. 39).  On September 19, 2014, the Appeals Council denied review.  Plaintiff filed for judicial review of the final decision on October 27, 2014.

## BACKGROUND FACTS

Plaintiff, born May 5, 1983, was 30 when ALJ Turner issued her decision  (Tr. 39, 173). She worked previously as an administrative assistant, cashier, and gas station clerk (Tr. 208).  Her application for benefits alleges disability as a result of colitis, back injury, and migraine headaches (Tr. 207).

### A.      Plaintiff's Testimony

Plaintiff offered the following testimony:

 She stood approximately 5'3," weighed 194 pounds, and was right-handed (Tr. 49). She was married and had four children aged 11, 7, 2, and 1 (Tr. 50).  She lived with her husband, children, and sister in a single-family home (Tr. 50).  She held a valid driver's license but did not drive (Tr. 51).

She completed two years of college, majoring in business administration (Tr. 51).  She

-2-

could read and write (Tr. 51).  She worked for one month as a home health aide since the alleged onset of disability during the time her husband was incarcerated (Tr. 52-54).  She quit due to hand and wrist problems; headaches; and auditory hallucinations (Tr. 53).  She first experienced hallucinatory "voices" at the age of 12 (Tr. 53).

Her former work as an administrative assistant involved keeping financial records (Tr. 55).  Her work as a cashier required her to take orders at a fast food restaurant (Tr. 56).  Her job as a gas station clerk involved cleaning, taking money, and keeping track of merchandise (Tr. 56-57).  The gas station clerk job required her to lift up to 20 pounds (Tr. 57).  She was terminated from the fast food position after taking excessive sick days for headaches (Tr. 57).  The clerk position ended when the gas station closed (Tr. 57).  She was unable to work at present due to back and wrist problems; headaches; and side effects from the psychotropic medications  (Tr. 57-58).  She received psychiatric treatment on a regular basis (Tr. 59).  She had not received treatment for back pain (Tr. 59).  Her psychiatrist was in the process of regulating her medication (Tr. 60).  She used splints for wrist pain (Tr. 61).  She experienced "pins and needles" and shooting pain in her hands and wrists (Tr. 62, 69).  She experienced trouble lifting even a gallon of milk and was unable to sit or stand for more than 20 minutes or walk for more than five (Tr. 63).

On a typical morning, she arose at 6:30 a.m. to help her sons prepare for school, then performed light housekeeping chores and cared for her one and two-year old children for the rest of the day with the help of her sister (Tr. 63-64).  Her husband put the children to bed

at night (Tr. 64). She seldom attended her children's school activities (Tr. 64). Her sister helped her with her hair (Tr. 64). She did not cook after "almost" burning the kitchen down due to forgetfulness (Tr. 65). She did not shop due to problems interacting with other people (Tr. 66). She first experienced memory problems about one year before the hearing (Tr. 67). On a typical day, she experienced a combination of indifference and the belief that others were "out to get [her]" (Tr. 68). Most days, she spent her waking hours in her bedroom with the shades drawn (Tr. 68). She typically experienced level "five" to "six" pain on a scale of one to ten and occasionally experienced level "eight" pain (Tr. 69). She did not experience significant manipulative manipulations (Tr. 70).

In response to questioning by her attorney, Plaintiff testified that she did not sleep well at night because she was afraid of the "shadow man" (Tr. 71). She experienced severe headaches four to five times a week (Tr. 71). She stated that her headaches "never stop[ped]" (Tr. 72).

**B. The Testimony of Plaintiff's Case Manager**

Tiffany Dawkins testified that she was Plaintiff's case manager at Saginaw Psychological Services (Tr. 73). She stated that she had been treating Plaintiff for six months; originally bi-weekly and more recently, on a weekly basis (Tr. 73). She reported that Plaintiff's one-month work attempt ended due to voices telling Plaintiff she was worthless, as well as physical problems (Tr. 74).

Ms. Dawkins stated that Plaintiff told her that she became "irritated" with others as

-4-

a result of the voices (Tr. 74). She acknowledged that Plaintiff did not currently have a therapist but "desperately need[ed] one" (Tr. 74). She stated that Plaintiff also had "a lot of self-esteem issues" (Tr. 74). She reported that Plaintiff's voices became worse after she began working (Tr. 75). Ms. Dawkins stated that her job was to check in on Plaintiff every two weeks and make sure that she was taking her medication and "talk to her about her daily activities" (Tr. 75). She stated that Plaintiff had been reporting thoughts of suicide for the past week (Tr. 76). She noted that Plaintiff's psychiatrist had considered hospitalizing her, but refrained from doing so because Plaintiff was living at home with others (Tr. 76). She stated that Plaintiff's sister moved in because Plaintiff was unable to "do anything for herself" at present (Tr. 77). She stated that during a visit to Plaintiff, she learned that the gas and water service had been discontinued (Tr. 78). She stated that Plaintiff told her that her children were "her greatest joy," and that she was "really good with them" (Tr. 79). Ms. Dawkins stated that Plaintiff reported that back pain was "usually the problem" (Tr. 79).

## C.   Medical Evidence

### 1.  Treating Sources

In July, 2011, Plaintiff sought emergency treatment for headaches (Tr. 277-286). Plaintiff reported blurred vision, photophobia, nausea, and sensitivity to sound (Tr. 277). She reported intermittent headaches for the past 20 years (Tr. 277). A CT was unremarkable (Tr. 279). She was administered intravenous medication before being released in stable condition (Tr. 282). The following month, Plaintiff sought emergency treatment for abdominal pain,

nausea, and diarrhea (Tr. 287). She was diagnosed with colitis (Tr. 289, 312). She was discharged three days later after symptoms "dramatically improved" (Tr. 290). She was prescribed Vicodin for pain in September, 2011 (Tr. 351). Treating records note that Plaintiff was fully oriented with a normal gait and station (Tr. 350). She sought treatment again in September, October, and November, 2011 for colitis (Tr. 316, 319, 327).

In December, 2011, Plaintiff sought treatment for psychiatric problems, reporting auditory and visual hallucinations and paranoia (Tr. 330). She reported that she began to hear voices at the age of 12 (Tr. 330). She reported "adequate money management skills" (Tr. 332). She reported obsessive compulsive disorder ("OCD"), depression, low self-esteem, anxiety, paranoia, and "extreme anger," but denied domestic or substance abuse problems (Tr. 334, 336). She was diagnosed with schizophrenia ("paranoid type") and assigned a GAF of 50[1] (Tr. 342).

January, 2012 treating records state that Plaintiff was fully oriented (Tr. 434). In March, 2012, Michael Ingram, M.D. performed a psychiatric assessment, noting Plaintiff's claim that she saw a "shadow man" (Tr. 386). She admitted that her husband urged her to seek treatment after she threw a chair at him (Tr. 386). She reported anxiety and the inability to sleep more than two hours at a time (Tr. 386). Dr. Ingram noted that Plaintiff was cooperative with clean clothing but only fair hygiene (Tr. 388). He assigned her a GAF of

---

[1]A GAF score of 41–50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* ("*DSM-IV-TR*") 34.

45 (Tr. 389).  The following month, Plaintiff reported fatigue but denied depression or paranoid ideation (Tr. 385).  He prescribed an increased dose of Latuda for "psychotic features" (Tr. 385).  In June, 2012, Dr. Ingram noted that Plaintiff appeared to be "doing worse" (Tr. 395).  Plaintiff reported that the water service had been cut off at her home (Tr. 395).  In October, 2012 psychological treating records state that Plaintiff required assistance in performing household chores, attending appointments, and shopping (Tr. 411).  Treating records note "questionable insight into current problems" (Tr. 431).  The same month, physical examination notes state that she exhibited a "good" mood and was fully oriented (Tr. 442).  Treating notes from the same month state that Plaintiff used wrist splints for "likely" Carpal Tunnel Syndrome ("CTS") (Tr. 429).  In December, 2012, she denied chronic pain (Tr. 424).  In March, 2013, Kachin Nagarkar, M.D. prescribed Trazodone (Tr. 422).

## 2.  Non-Treating Sources

In February, 2012, Michael Brady, Ph.D. performed a consultative examination on behalf of the SSA, noting Plaintiff's report of headaches and colitis (Tr. 343).  He noted Plaintiff's statement that she did not experience mental problems and that she was "an angel" and others were demons (Tr. 343).  She described symptoms of OCD but claimed good relationships with her husband and children (Tr. 343).  Her activities included "cleaning the house and reading" (Tr. 344).  She exhibited a normal gait with good posture (Tr. 344).  She reported that she drove herself to the examination (Tr. 343).  Dr. Brady found that Plaintiff's ability "to relate and interact with others, including coworkers and supervisors is very

-7-

impaired. Her ability to understand, recall, and complete tasks and expectations is impaired"
with a "poor" ability to concentrate (Tr. 346). He also found that "her ability to withstand
the normal stressors associated with a workplace setting is impaired" (Tr. 346). He found
that she would "struggle to deal with normal workplace stressors appropriately" (Tr. 346).
Dr. Brady assigned Plaintiff a GAF of 45 (Tr. 346).

In July, 2012, psychologist Ron Marshall, Ph.D performed a non-examining review
of the mental health records, finding mild restriction in activities of daily living and moderate
restriction in social functioning and concentration, persistence, or pace (Tr. 96). He
concluded that Plaintiff could perform "rote tasks" and could "follow and retain simple
instructions" (Tr. 101). He found that she would "work better with brief interactions with
others" (Tr. 101).

### D. Vocational Expert

The VE classified Plaintiff's past relevant work as an administrative assistant as
sedentary and skilled and work as a cashier as exertionally light and unskilled[2] (Tr. 81). The
VE found that Plaintiff had transferable skills from the administrative position that would

---

[2]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or
carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50
pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and
that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with
frequent lifting or carrying of objects weighing up to 50 pounds.

allow her to work as a receptionist and data entry clerk (Tr. 81). The ALJ then described the following hypothetical individual to the VE, using Plaintiff's age, education, and work background:

> Assume this individual's limited to medium work. She could frequently climb ramps and stairs, ladders, ropes, and scaffolds. She would have no limitations regarding balancing. She could frequently stoop, kneel, crouch, and crawl. She'd be limited to simple, routine, tasks. No interaction with the general public or coworkers, occasional interaction with supervisor (Tr. 81).

The VE testified that while all of Plaintiff's past relevant work would be eliminated, she could perform the unskilled, medium work of a custodian (38,000 positions in the State of Michigan); assembler (24,000); and machine operator (10,000). The VE testified that if the same individual were additionally limited by the need to miss two days of work each month, all gainful employment would be precluded (Tr. 83).

In response to questioning by Plaintiff's attorney, the VE found that if the individual were off task between 10 and 15 percent of the work day due to "internal stimuli" or the medication side effect of "grogginess," all gainful employment would be eliminated (Tr. 83).

### E. The ALJ's Decision

Citing the medical transcript, ALJ Turner found that although Plaintiff experienced the severe impairments of "schizoaffective disorder; obsessive compulsive disorder; and personality disorder," the conditions did not meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4 (Tr. 28-30). The ALJ found that the conditions of wrist pain, back pain, colitis, migraine headaches, and obesity were non-severe

(Tr. 29). She found that Plaintiff's alleged vision complaints were "'not medically determined'" (Tr. 29).

The ALJ found that Plaintiff experienced mild limitation in activities of daily living, moderate limitation in social functioning and mild limitation in concentration, persistence, or pace (Tr. 30-31). The ALJ noted that Plaintiff was able to take care of her personal needs, shop by telephone or internet, and handle finances (Tr. 31). The ALJ determined that Plaintiff retained the residual functional capacity ("RFC") for unskilled, medium work with the following additional limitations:

> She can frequently climb ramps and stairs. The claimant can frequently climb ladders, ropes, or scaffolds. She has no balance limitations. The claimant can frequently kneel, stoop, crouch, and crawl. The claimant can perform simple, routine, repetitive tasks. She can occasionally interact with supervisors. The claimant cannot interact with coworkers or the public (Tr. 32).

Citing the VE's testimony, the ALJ found that Plaintiff could perform the work of a custodian, assembler, and machine operator (Tr. 38).

The ALJ discounted Plaintiff's allegations of limitation. She found that Plaintiff's allegations of physical limitations were not supported by the record, noting that the claims of lifting restrictions due to back pain and manipulative limitations were contradicted by observations of a normal gait and her acknowledgment that she had the strength to "grip a chair and throw it at her husband" (Tr. 29). The ALJ noted that "inconsistent statements weighed against her credibility in general" (Tr. 30). She cited Plaintiff's testimony which included both the claim that her husband did all the housework, and, that she "washed dishes,

swept, vacuumed, and dusted for hours at a time" (Tr. 30).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less than a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*   800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff makes four arguments for remand.  First, she argues that the ALJ erred by according little weight to Dr. Brady's[3] consultative findings. *Plaintiff's Brief,* 10-13*, Docket #12.*  Second, she contends that the ALJ failed to include a "function-by-function" assessment of her work abilities.  *Id.* at 13-14.  Plaintiff argues third that the RFC found in the administrative opinion did not reflect the finding that she experienced the severe impairments of schizoaffective disorder, OCD, and personality disorder.  *Id* at 15-18.

---

[3]Plaintiff's counsel (perhaps confusing Plaintiff's name with the name of the consultative psychologist) erroneously refers to Dr. Brady as "Dr. Bradley."

Finally, she contends, in effect, that the RFC did not reflect all of her work-related mental impairments. *Id.* at 18-19.

Plaintiff's argument that Dr. Brady's February, 2012 findings were entitled to controlling weight will be considered first. The remaining arguments all pertain to the limitations found in the RFC and will be considered in tandem.

### A. Dr. Brady's Consultative Opinion (Argument 1)

Plaintiff argues first that the ALJ erred by according little weight to Dr. Brady's consultative findings that the ability to interact with others was "very impaired;" that "effectiveness and performance will likely be limited and slowed;" and that she would "struggle to deal with normal workplace stressors appropriately" (Tr. 346). She also contends that the ALJ failed to provide an adequate rationale for rejecting Dr. Brady's opinion.

Plaintiff is correct that under SSR 96–6p, an ALJ is required to discuss the weight accorded to the State agency opinions. 1996 WL 374180, *2 (July 2, 1996); 20 C.F.R. § 404.1527(e)(2) (ii-iii). However, because Dr. Brady was a one-time consultative examiner rather than a treating source, his opinion was "entitled to no special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994). The ALJ nonetheless explained her reasons for giving "little weight" to Dr. Brady's findings. She noted that Dr. Brady's finding of potentially disabling mental limitations was undermined by Plaintiff's ability to drive herself independently to the appointment, work while her husband was in jail, and "take care

of a large family under a great deal of economic stress" (Tr. 36). While Plaintiff argues that these reasons were inadequate to reject Dr. Brady's findings, the ALJ cited portions of the record showing that Plaintiff was able to care for her children. The ALJ noted "no evidence that the child protective services was contacted in order to safeguard [Plaintiff's] children" (Tr. 34). She noted Plaintiff had not been hospitalized for psychiatric problems and displayed a normal mood and affect during treating examinations for physical conditions (Tr. 33-35).

The ALJ observed that when Plaintiff applied for benefits, she did not mention psychiatric conditions and "did not make any strange comments" during a telephone interview (Tr. 33). The ALJ noted that Plaintiff was able to procure employment while her husband was in jail and that both a social worker and case manager found that Plaintiff was able to care for her children well despite economic stressors (Tr. 34-35). The ALJ cited the report by Plaintiff's husband that Plaintiff was able to interact with family members by telephone and use the internet (Tr. 36). She noted that Plaintiff's testimony that she spent most of the day with the shades drawn in her bedroom contradicted her earlier testimony that she arose at 6:30 a.m. to prepare her children for school and then performed other household chores (Tr. 36, 63-64, 68). She gave "significant weight" to Dr. Marshall's opinion that Plaintiff could preform a range of unskilled work (Tr. 36).

Plaintiff's related argument that the ALJ was required to recontact Dr. Brady if she believed there was a conflict between Dr. Brady's findings and the other evidence is without

-14-

merit. *Plaintiff's Brief* at 12 (*citing* 20 C.F.R. § 404.1512(e)). However, on March 26, 2012, the regulation was amended, "eliminating paragraph (e), 'Recontacting medical sources.'" *Davis-Augustin v. Colvin*, 2015 WL 5042752, *11 (N.D. Fla. Aug. 26, 2015). Under the current applicable regulation, "after weighing the evidence," the ALJ *may* seek "additional evidence or clarification" if s/he "cannot reach a conclusion about whether" the claimant is disabled. 20 C.F.R. § 404.1520b(c)(1).

However, under either the old or new regulation, the ALJ was not obligated to recontact Dr. Brady. "[A]n Administrative Law Judge need recontact a medical source only if the evidence received from that source is inadequate for a disability determination." *DeBoard v. Commissioner of Social Sec.*, 2006 WL 3690637, *5 (6th Cir. December 15, 2006); § 404.1512(e). "Absent a gap in the record, the ALJ has no duty to recontact the physician." *Starkey v. Commissioner of Social Sec.,* 2008 WL 828861, *4 (W.D.Mich. March 26, 2008) (*citing Johnson v. Barnhart,* 138 Fed. Appx. 186, 189, 2005 WL 1414406, *3 (11th Cir. June 17, 2005); SSR 96–5p. The ALJ noted that Dr. Brady's findings were contradicted by Plaintiff's testimony, her husband's report, and the treating and other non-treating medical evidence. Because substantial evidence supports the rejection of Dr. Brady's opinion, a remand on this basis is not warranted.

### B. Plaintiff's Additional Arguments (Arguments 2-4)

Plaintiff argues second that the ALJ failed to include a "function-by-function" assessment of her work abilities in crafting the RFC. *Plaintiff's Brief* at 13-14; C.F.R. §

404.1545(a).

Under § 404.1545(a), the RFC is defined as "the most" a claimant "can still do despite [his/her] limitations." The RFC must be based on "all the relevant evidence" in [the] case record. An evaluation of the alleged mental limitations must include evaluation of "limitations in understanding, remembering, and carrying out instructions;" and "responding appropriately to supervision, co-workers, and work pressures in a work setting." § 404.1545(c).

Plaintiff's claim that the ALJ impermissibly rejected Dr. Brady's findings and substituted her own judgment in crafting the RFC is without merit. As stated by the ALJ, the psychological limitations in the RFC are based on psychologist Ron Marshall, Ph.D's July, 2012 review of the mental health records (Tr. 36, 96). Dr. Marshall found that Plaintiff did not experience significant limitations in understanding, remembering, or carrying out simple instructions (Tr. 99-100). He concluded that Plaintiff could perform "rote tasks" and could "follow and retain simple instructions" (Tr. 101). The RFC in large part reflects those findings.

For identical reasons, Plaintiff's argument that the ALJ did not support her findings regarding the "work-related mental activities" found in the RFC should be rejected. Under SSR 96-8p, these activities entail the ability to "understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work

-16-

setting."  1996 WL 374184,*6 (July 2, 1996).

Dr. Marshall's assessment addresses all of the applicable work-related mental functions (Tr. 99-101).   The ALJ made clear that she relied largely on Dr. Marshall's findings in crafting the RFC (Tr. 36).   She stated that she accorded "significant weight" to Dr. Marshall's findings regarding the work-related mental limitations (Tr. 36).   The ALJ deviated from Dr. Marshall's findings only to the extent that she crafted a more restrictive RFC by limiting Plaintiff to occasional interaction with supervisors and no interaction with coworkers or the public (Tr. 32, 100).

In her third argument, Plaintiff argues that the RFC did not reflect her full degree of psychological limitation as a result of schizoaffective disorder, OCD, and personality disorder.  *Plaintiff's Brief* at 15-18.   However, as noted in detail by the ALJ, Plaintiff's claims of disabling psychological limitation were undermined by her ability to work, care for a large family, keep her children on a schedule, use a computer, and drive.   The ALJ did not err in finding that Plaintiff's ability to engage in these activities undermined her claim of disability.  *See Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 531 (6th Cir.1997); *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir.1993)(discounting credibility "appropriate" where the testimony and medical records contradict the allegations of disability).

Plaintiff's final argument seems to suggest that the ALJ erroneously applied the factors in determining whether Plaintiff was disabled at Step Three to the RFC.   This

argument is without merit.  In determining that Plaintiff did not meet or medically equal a listed impairment at Step Three of the administrative sequence, the ALJ found mild limitation in activities of daily activities and moderate limitation in social functioning and mild limitation in concentration, persistence, or pace[4] (Tr. 30-32).  Contrary to Plaintiff's contention, the ALJ went on to support the RFC with Dr. Marshall's assessment of the work-related functions as required by SSR 96-8p and 20 C.F.R. § 404.1545(c).

This recommendation should not be read to trivialize Plaintiff's limitations.  However, the ALJ's summation of the record is well developed and supported by substantial evidence. Regardless of whether or not my decision would be different on *de novo* review, the ALJ's determination that Plaintiff is capable of unskilled medium work is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court.  *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment [Docket #15] be GRANTED and that Plaintiff's Motion for Summary Judgment [Docket #12] be DENIED.

---

[4]

A disability finding at Step Three would require marked (as opposed to mild or moderate) limitation in two categories or one marked finding accompanied by repeated episodes of decompensation.  20 C.F.R., Part 404, Subpart P, Appendix 1 § § 12.03, 1208. While the ALJ stated that the RFC reflected "the degree of limitation" found in the Step Three findings, the RFC is independently supported by Dr. Marshall's findings (adopted by the ALJ) of work-related mental limitations.

-18-

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: November 13, 2015

-19-

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was sent to parties of record on November 13, 2015, electronically and/or by U.S. mail.

s/C. Ciesla
Case Manager